**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| PATRICK J. BURNS, III<br><br>Plaintiff,<br><br>v.<br><br>CITY OF BAYONNE, et al.,<br><br>Defendants. | Civil Action No.: 12-6075 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of four motions to dismiss Plaintiff Patrick J. Burns, III's ("Plaintiff" or "Sgt. Burns") Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (CM/ECF Nos. 53-56). No oral argument was heard pursuant to Federal Rule of Civil Procedure 78. The Court has considered the submissions and arguments made in support of and in opposition to the instant motions. For the reasons set forth below, Defendants' motions are granted.

**I. BACKGROUND**

On August 18, 2013, Sgt. Burns filed an Amended Complaint ("FAC") against the following defendants: (1) the City of Bayonne (the "City"); (2) the Bayonne Police Department ("BPD"); (3) Mark Smith, former Director of Public Safety and current Mayor of the City of Bayonne and supervisor of Plaintiff ("Mayor Smith") (FAC ¶ 6); (4) Plaintiff's direct supervisor, BPD Chief Robert Kubert ("Chief Kubert") (FAC ¶ 7); (5) Captain Peter Nevins, an officer with the BPD and Captain of the Internal Affairs Division ("Capt. Nevins") (FAC ¶ 8); (6) Lieutenant Timothy Farrell, an officer with the BPD and a member of the Internal Affairs Division ("Lt.

1

Farrell") (FAC ¶ 9); (7) Officer William Kobryn, a member of the BPD and President of the Bayonne Chapter of the PBA ("Officer Kobryn") (FAC ¶ 10); (8) Director of Public Safety Jason O'Donnell (FAC ¶ 11); and (9) John Does 1-10.

As per Plaintiff's Amended Complaint, this action arises out of the alleged "illegal discharge" of Plaintiff Burns from his position as a Sergeant with the BPD. (CM/ECF No. 1 ¶ 1) ("FAC"). The Complaint alleges that as of 1995, when Plaintiff began working for the BPD, he was subject to physical and verbal abuse and ridicule by members of the BPD. (FAC ¶¶ 13-14). Plaintiff alleges that the BPD twice improperly sought his termination.

The first time BPD sought Plaintiff's termination was as a result of the so-called "Quick Check incident." Plaintiff alleges that while on duty in 2006, he observed an individual under the influence of alcohol in a Quick Check store. (FAC ¶ 31). The salesperson asked Plaintiff to remove this individual from the establishment. (FAC ¶ 32). When the individual refused to leave and cursed at Plaintiff, Plaintiff escorted him out of the store. (FAC ¶ 33). It was at this point that the individual informed Plaintiff that he was Captain Murphy's nephew. (FAC ¶ 34). The following day, Captain Murphy confronted Plaintiff about the incident and demanded he apologize to his nephew. (FAC ¶ 36).

The next day, Captain Murphy's nephew signed a complaint at police headquarters alleging that he was assaulted by Plaintiff. (FAC ¶ 37). Plaintiff claims that Captain Murphy met privately with his nephew prior to the interview and was present during the interview, in violation of BPD policy. (FAC ¶ 38). As a result of the complaint, Plaintiff was placed on "intensive supervision." (FAC ¶ 39). Plaintiff alleges that he was the only Sergeant ever placed on extended intensive supervision. (FAC ¶ 40).

2

Further, Plaintiff alleges that BPD sent the surveillance video from the Quick Check incident to the prosecutor's office "seeking to have criminal charges brought against [Plaintiff]." (FAC ¶ 42). Despite the prosecutor's office finding no basis for an assault charge and having "refused involvement," Plaintiff claims that on April 14, 2007 BPD brought fourteen charges against him as a result of the incident, including physical assault on Captain Murphy's nephew. (FAC ¶ 43).

On July 24, 2008, Plaintiff filed a lawsuit in New Jersey state court against the City, BPD, and numerous other individuals, including Mayor Smith and Chief Kubert. (FAC ¶ 45). According to Plaintiff, his complaint alleged: (1) "that he had been subject to systematic, organized and corrupt abuses by his superiors and fellow officers in the BPD"; (2) "that he had been subject to systematic, organized and corrupt abuses by his superiors and fellow officers in the BPD"; (3) "that promotions were halted for a three-year period, even though eight positions were available, to deliberately deny Sgt. Burns a promotion, who was number one on the effective list"; (4) "that he had been physically assaulted by a fellow officer"; (5) "that unwarranted disciplinary complaints were filed against him; and (6) "that Sgt. Burns' personal firearms were confiscated by BPD in violation of his constitutional rights." *Id.* The complaint also "sought to enforce a global settlement between Sgt. Burns and the defendants, which would have permanently enjoined the disciplinary charges arising from the Quick Check incident." *Id.* In August 2009, Plaintiff's state court claims were dismissed. (FAC ¶ 47).

Nearly a year later, in September 2009, BPD's hearing officer found Plaintiff guilty of assault on Captain Murphy's nephew. (FAC ¶ 49). Plaintiff received a Final Notice of Disciplinary Hearing and was terminated. *Id.* Plaintiff appealed his termination to the Office of Administrative Law ("OAL"). In March 2010, the Honorable JoAnn LaSala Candido, A.L.J.

3

ordered that Plaintiff be reinstated with full back pay and seniority and reimbursement of insurance premiums. (FAC ¶¶ 49, 54). After Chief Kubert and Mayor Smith continued to refuse to reinstate Plaintiff, the Civil Service Commission affirmed Judge Candido's decision and ordered the City to reinstate Plaintiff within ten days or be subject to a fine. (FAC ¶¶ 53-55). Plaintiff was reinstated on August 30, 2010, but did not return to patrol until September 18 of that year. (FAC ¶ 58).

Plaintiff alleges that "immediately" upon his reinstatement pursuant to Judge Candido's Order, "Mayor Smith, Chief Kubert and Director O'Donnell...conspired to have Sgt. Burns removed from the BPD...." (FAC ¶ 67). Plaintiff claims that they "intended to use the September 18, 2010 chase as a pretext." *Id.* This incident allegedly involved a motor vehicle chase where the driver "was a drug distributor who was in the process of conducting a drug delivery...." (FAC ¶ 62). The driver was allegedly a "five [] time convicted drug dealer and had recently been released from New Jersey State Prison after serving a ten [] year drug distribution sentence." (FAC ¶ 64). Plaintiff alleges that "[d]espite the successful apprehension of a known felon, Sgt. Burns' supervisors claimed that he did not [] 'call the chase into headquarters in a timely fashion,' use appropriate radio protocol or follow pursuit guidelines." (FAC ¶ 65). Further, "[d]uring the episode, [he] was attempting to contact dispatch. The episode was thirty [] seconds long: twenty-six [] of those seconds were Sgt. Burns attempting to contact dispatch and four [] of those seconds were dispatch communicating with Sgt. Burns." (FAC ¶ 66).

As a result of that incident, "Sgt. Burns was notified that he was under investigation...and removed from patrol." (FAC ¶ 69). He alleges that "[f]or three-and-a-half years prior to Sgt. Burns' return to patrol on September 18, 2010, Mayor Smith and others had been trying to remove Sgt. Burns from the BPD." (FAC ¶ 68). Plaintiff further alleges that "[i]n

4

order to have [him] brought up on criminal charges, which would result in his termination[,] BPD forwarded the September 18th incident to the Prosecutor's office for review." (FAC ¶ 71). Plaintiff claims that "no other matter[] for similar alleged violations[] has been forwarded to the Prosecutor's office for review." (FAC ¶ 72). However, the Prosecutor's office "exonerated Sgt. Burns of any wrongdoing." (Compl. ¶¶ 107-108).

Regardless, it is Plaintiff's position that in mid-October, 2010, he was allegedly informed that "'[he] was no longer a member of the PBA and had no recourse.'" (FAC ¶ 74).[1] Plaintiff asserts that he met with PBA President Officer Kobryn, PBA Treasurer Ken Maak, the City's PBA State Delegate Matt Lindquist and Lieutenant Neil Ward in or around October 2010. (FAC ¶ 75). Plaintiff also asserts that he was told that "the reason he was 'ousted' from the PBA was specifically his lawsuit, which he instituted and which they felt 'hurt the organization and its members as well as directly and specifically hurting Chief Kubert, Mayor Mark Smith and [Officer Kobryn].'" (FAC ¶ 76). Further, "[d]uring the above-referenced conversation, Sgt. Burns confirmed with President Kobryn that the reason that he was no longer a member of the PBA was because he sued the BPD . . . .[B]oth President Kobryn and Mr. Lindquist responded emphatically, 'Yeah, basically.'" (FAC ¶ 77).

Further, Sgt. Burns asserts that "President Kobryn, the PBA and the BPD knew in March, April, and May that Sgt. Burns would be returning to work, while they maliciously refused to make any payments or keep him in good standing with his local union, thereby denying him the benefits entitled to members of the PBA." (FAC ¶ 78). Because of this, "Sgt. Burns was not covered under the State PBA Legal Protection Plan for the time-frame in which the September 18, 2010 incident occurred, causing Sgt. Burns to hire a PBA attorney at his own personal costs

---

[1] Although the Complaint does not define the term PBA, Plaintiff is likely referring to the Policemen's Benevolent Association.

5

for legal representation." (FAC ¶ 79). Plaintiff additionally alleges that his "ousting" was in direct violation of the state rules and regulations and Local PBA By-Laws and [that] President Kobryn was directed by the State Delegate to immediately reinstatement [him]." (FAC ¶ 80). During a subsequent meeting with Plaintiff, Officer Kobryn allegedly stated that "even though he was being ordered to reinstate Sgt. Burns in the PBA, [] the PBA would not pay for his legal fees related to the September 18, 2010 incident and would immediately start proceedings to have him removed from the PBA." (FAC ¶ 81).

On November 19, 2010, Captain Nevins, Lt. Farrell and Director O'Donnell allegedly told Plaintiff that he was being suspended immediately, without pay, pending the outcome of his departmental trial. (FAC ¶ 82). The purported reasons for the suspension were that Plaintiff was a danger to himself and the public. (FAC ¶ 84). Plaintiff then asked who decided that he was a danger to himself and the public. (FAC ¶ 85). Director O'Donnell responded that he was the one who made the determination. (FAC ¶ 86). Plaintiff alleges that, upon information and belief, no other officer has ever been suspended without pay without a prior departmental hearing. (FAC ¶ 88). He claims that only three officers have ever been dismissed for disciplinary reasons: one for drug offenses and the other two for aggravated assault and weapons offenses. (FAC ¶ 89). Plaintiff maintains that his "treatment was a direct [] result of having filed a civil complaint against the City, Mayor Smith and Chief Kubert[,] and having challenged his termination following the Quick Check incident." (FAC ¶ 90).

Plaintiff alleges that "[a]n unprecedented investigation of [him] followed, with the sole purpose to create justification for his termination." (FAC ¶ 91). He claims that "the investigation and report of the September 18, 2010 incident relied on false and inaccurate representations of the record, even contradicting itself as to the allegations contained therein."

(FAC ¶ 92). Plaintiff further claims that Lt. Farrell and Capt. Nevins were responsible for some of the some alleged falsities and inconsistencies. (FAC ¶ ¶ 93-94). He also alleges that the video footage from his patrol car disproved BPD's allegations that "he failed to follow appropriate procedures by running a red light and almost striking two civilians." (FAC ¶ 95). In fact, he alleges that the footage "showed that the alleged []red light[] was []green[] and that the civilians [he] allegedly endangered never altered their conduct as a result of the pursuit and were never in any danger." *Id.*

Plaintiff also claims that BPD told the Prosecutor's Office to make the drug charges against the driver Plaintiff arrested on September 18, 2010 "'go away.'" (FAC ¶ 98). He alleges that "[i]n order to remove [him] from the BPD, the highest levels of BPD and the City[] refused to prosecute a convicted felon and drug dealer." (FAC ¶ 100).

On February 14, 2011, following a departmental trial, Sgt. Burns allegedly received a Final Notice of Discipline by the BPD and was immediately terminated. (FAC ¶ 101). Plaintiff alleges that "[s]ince his termination, several members and formal members of the BPD have advised [him] that he was railroaded and that he should have known that he could not fight 'City Hall.'" (FAC ¶ 102).

The First Amended Complaint asserts the following causes of action: (1) 42 U.S.C. § 1983 – First Amendment; (2) 42 U.S.C. § 1983 – *Monell* Liability; and (3) "New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et. seq.* NJ Constitution."

The following defendants filed motions to dismiss Plaintiff's Complaint: (1) Capt. Nevins and Lt. Farrell (CM/ECF No. 53); (2) Officer Kobryn (CM/ECF No. 54); (3) Mayor Smith and Director of Public Safety Jason O'Donnell (CM/ECF No. 55); and (4) the City, Chief Kubert, and the BPD (CM/ECF No. 32).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's short and plain statement of the claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## III. DISCUSSION

### A. The Motions Before the Court

#### 1. Capt. Nevins and Lt. Farrell

Capt. Nevins and Lt. Farrell (collectively "IA Defendants" or "Internal Affairs Defendants") assert that the action should be dismissed as to them because: (1) Plaintiff's First Amendment claim cannot be sustained because the underlying convictions have not been reversed on direct appeal or impaired by collateral proceedings; (2) the Amended Complaint

lacks facial plausibility as the factual content does not allow the Court to draw the reasonable inference that the IA Defendants are liable for the misconduct alleged; and (3) the IA Defendants are entitled to protection under the doctrine of qualified immunity. (CM/ECF No. 53-3). In addition, in their reply, the IA Defendants argue that the action should be dismissed as to them because (1) the Plaintiff has failed to clearly establish a prima facie case of retaliation; and (2) the adverse employment charges and internal investigation conducted by them have been substantiated by an impartial judicial officer. (CM/ECF No. 67).

### 2. Director of Public Safety Jason O'Donnell and Mayor Smith

Defendant Mayor Smith, who is the current Mayor of the City of Bayonne and a former police officer and Director of Public Safety, and Jason O'Donnell, the current Director of Public Safety, assert that the Complaint should be dismissed in light of the following: (1) Plaintiff's claims are barred by the two-year statute of limitations applicable to claims asserted under § 1983; (2) Plaintiff's failure to allege a matter of public concern is fatal to his § 1983 and New Jersey Civil Rights Act claims; (3) Defendants are entitled to qualified immunity; and (6) the Complaint is barred by the doctrines of res judicata and collateral estoppel, as well as New Jersey's entire controversy doctrine. (CM/ECF No. 55-1).

### 3. The City, Chief Kubert, and the BPD

The City, Chief Kubert, and the BPD (collectively "City Defendants") make the following arguments in their motion to dismiss: (1) the Court should dismiss Plaintiff's time barred claims; and (2) Plaintiff has failed to state a claim upon which relief can be granted because he has not demonstrated that he addressed matters of public concern and has not established a causal link between his alleged protected activity and the retaliatory action. (CM/ECF No. 56-1).

### 4. Officer Kobryn

Officer Kobryn makes the following arguments in support of his motion to dismiss: (1) Plaintiff's Amended Complaint fails to meet the federal pleading requirements; (2) Plaintiff has failed to allege a constitutional claim; and (3) res judicata and collateral estoppel warrant dismissal of Plaintiff's Amended Complaint. (CM/ECF No. 54-2).

### 5. Plaintiff's Opposition

In opposition to the instant motion, Plaintiff argues: (1) his Amended Complaint meets the federal pleading standards; (2) his claims are not barred by the applicable two-year statute of limitations; (3) he has alleged constitutional claims sufficient to sustain causes of action pursuant to § 1983 and the New Jersey Civil Rights Act; and (3) res judicata, collateral estoppel, and New Jersey's entire controversy doctrine are inapplicable. (CM/ECF No. 61).

## B. Statute of Limitations

Defendants argue that Plaintiff's § 1983 claim is barred by the relevant statute of limitations because his Complaint includes allegations dating back to 1995. Defendants may prevail on the statute of limitations at the motion to dismiss stage if it is apparent from the face of the complaint that the cause of action is barred. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (citation omitted). "If the allegations, taken as true, show that relief is barred by the applicable statute of limitations, a complaint is subject to dismissal for failure to state a claim." *Cain v. Dep't of Pub. Welfare*, 442 F. App'x. 638 (3d Cir. 2011) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1987)).

The applicable statute of limitations for a claim brought under § 1983 is that of a personal injury claim in the state in which the claim arises. *Owens v. Okure*, 488 U.S. 235, 249-50 (1989); *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989). Under New

Jersey law, a personal injury claim must be brought within two years of the date of accrual. N.J.S.A. 2A:14-2. Therefore, the statute of limitations for § 1983 claims in New Jersey is two years. *Cito*, 892 F.2d at 25; *O'Connor v. City of Newark*, 440 F.3d 125, 126-27 (3d Cir. 2006). Similarly, the parties agree that civil rights claims brought under New Jersey's Civil Rights Act are also subject to a two-year statute of limitations. *Brown v. City of Newark*, 2010 U.S. Dist. LEXIS 40564, 2010 WL 1704748, at * 4 (D.N.J. Apr. 26, 2010); *Gibson v. Superintendent of N.J. Dep't of Law & Pub. Safety*, Civ. No. 02-5470, 2007 U.S. Dist. LEXIS 22871, at *3 (D.N.J. Mar. 29, 2007). Under federal law, a § 1983 cause of action accrues when the allegedly wrongful act occurred. *See Wallace v. Kato*, 549 U.S. 384, 388 (2007) ("It is 'the standard rule that accrual occurs when the plaintiff has a complete and present cause of action, that is, when 'the plaintiff can file suit and obtain relief.'") (internal citations and alterations omitted).

The instant action was filed on September 27, 2012. [CM/ECF No. 1]. Sgt. Burns was allegedly suspended without pay on November 19, 2010 and terminated on February 14, 2011. (FAC ¶¶ 137, 138). Thus, the alleged act of retaliation, i.e. Sgt. Burns' termination, accrued within the relevant two-year period. *See, e.g., Braxton v. City of Newark*, 2011 U.S. Dist. LEXIS 118665, at *39 (D.N.J. Oct. 13, 2011); *Nance v. City of Newark*, 2010 U.S. Dist. LEXIS 64606, at *5-7 (D.N.J. 2010) ("The statutory period . . . is calculated from the date of Plaintiff's termination (i.e., the act of retaliation)—not from the date that Plaintiff filed his various complaints. . . . Accordingly, the date of accrual for Plaintiff's retaliation claims is the date that the adverse action(s), if any, were taken against him."). Plaintiff's claims therefore fall within the relevant two-year period and are not time-barred.

### C. First Amendment Retaliation Claim

#### 1. Matter of Public Concern

11

Plaintiff brings his claims under § 1983, which provides civil remedies against any person who, under color of state law, deprives another of rights protected by the United States Constitution, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.[2] Section 1983, does not, by itself, confer any substantive rights, it only serves to enforce rights granted under the Constitution or federal law. *Mayer v. Gottheiner*, 382 F. Supp. 2d 635, 646-47 (D.N.J. 2005). Here, Plaintiff claims a violation of the First Amendment because Defendants allegedly retaliated against him for pursuing a civil lawsuit and challenging his termination after the Quick Check incident. (FAC ¶¶ 107, 115). "To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006). When considering a violation of the free speech clause of the First Amendment, the Third Circuit Court of Appeals utilizes the following analytical framework:

> A public employee's statement is protected activity when (1) in making it, the employee spoke as a citizen, (2) the statement involved a matter of public concern, and (3) the government employer did not have an adequate justification for treating the employee differently from any other member of the general public as a result of the statement he made. . . .Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.

*Hill*, 455 F.3d at 241-42 (internal quotations and citations omitted).

---

[2] The NJCRA was modeled after § 1983, and thus courts in New Jersey have generally looked at claims under the NJCRA "through the lens of § 1983." *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443-44 (D.N.J. 2011); *see also Chapman v. New Jersey*, 2009 U.S. Dist. LEXIS 75720, at *3 (D.N.J. Aug. 25, 2009) ("Courts have repeatedly construed the NJCRA in terms nearly identical to its federal counterpart...."); *Armstrong v. Sherman*, No. 09-716, 2010 U.S. Dist. LEXIS 55616, at *5 (D.N.J. June 4, 2010) ("[T]he New Jersey Civil Rights Act is a kind of analog to section 1983 ...."); *see generally Hedges v. Musco*, 204 F.3d 109, 121 n. 12 (3d Cir. 2000) (concluding that New Jersey's constitutional provisions concerning search and seizures are interpreted analogously to the Fourth Amendment). Thus, this Court's analysis of Plaintiff's § 1983 claim also applies to his claim under New Jersey law.

Plaintiff alleges that the following allegations contained in his civil complaint constituted protected speech: (1) "he had been subject to systematic, organized and corrupt abuses by his superiors and fellow officers in the BPD"; (2) "promotions were halted for a three-year period, even though eight positions were available, to deliberately deny Sgt. Burns a promotion, who was number one on the effective list"; (3) "he had been physically assaulted by a fellow officer"; (4) "unwarranted disciplinary complaints were filed against him"; and (5) "his personal firearms were confiscated by BPD in violation of his constitutional rights." (FAC ¶ 45). The complaint also "sought to enforce a global settlement between Sgt. Burns and the defendants, which would have permanently enjoined the disciplinary charges arising from the Quick Check incident." *Id.*

Defendants assert that Plaintiff's personal grievances are not "protected" speech as a matter of law under *Connick v. Myers*, 461 U.S. 138 (1983). They argue that Plaintiff's Amended Complaint does not satisfy the requisite elements for proving that a public employer violated a public employee's speech rights through retaliation, which are: (1) the speech in question was a matter of public concern; (2) the plaintiff's interest in the speech outweighs the state's interest in promoting the efficiency of the public services it provides through its employees; and (3) that the protected speech was a substantial or motivating factor in the alleged retaliatory action. *See Braxton*, 2011 U.S. Dist. LEXIS 118665, at *25-37; *see also Hill*, 455 F.3d at 241. Whether speech is protected as a matter of public concern is a question of law. *Hill*, 455 F.3d at 241.

In *Connick v. Myers*, a public employee, Sheila Myers, brought a Section 1983 action claiming that her First Amendment rights were violated when she was terminated from her position as an Assistant District Attorney due to her polling of her co-workers through a questionnaire that she drafted soliciting views on their satisfaction with various aspects of their

employment at the District Attorney's office in Orleans Parish. The questionnaire was distributed after she was transferred to prosecute cases in a different section of the criminal court, and she refused, making complaints about the office transfer policy, the need for a grievance committee, and other concerns. The Supreme Court distinguished between speech as a citizen on matters of "public concern" and speech as an employee on matters of "personal interest," holding that "when an public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personal decision taken by a public agency allegedly in reaction to the employee's behavior." *Connick*, 461 U.S. at 147. The Court stated that the "content, form and context" of the statement bear on the question of public concern. *Id.* at 147-8. Further, "when an employee expression cannot be fairly considered as relating to any matter of political, social or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.* at 146.

Defendants cite several cases to show that Plaintiff's speech involved personal grievances rather than matters of public concern. In *Cooper v. Cape May County Bd. Of Soc. Servs.*, plaintiff clerk in the County offices complained to the NJDOP concerning a dispute with his supervisors about a difficult working relationship with a co-worker, leave authorization, a reprimand about time cards, and the use of a postage meter. 175 F. Supp. 2d 732 (D.N.J. 2001). Plaintiff argued that his complaints were a matter of public concern because they implicated issues of public employee job classifications within the Civil Service System, and were thus entitled to protection under the First Amendment. The Court found that plaintiff's complaint

was "related directly to his own situation" and "was motivated at all times by concern for . . . [that] situation, rather than by a desire to ensure formal adherence to a statutory employment scheme or to expose wrongdoing on the part of his superiors in the name of the public good." *Id.* at 745. In *Kadetsky v. Egg Harbor*, the Court held that a teacher's speech about school policy, in which he alleged that his employers set out to create a false record of poor work performance to deny him tenure, was not a matter of public concern but motivated by plaintiff's desire to protect his employment and reputation. 164 F. Supp. 2d 425 (D.N.J. 2001). In *Borough of Duryea v. Guarnieri*, 131 S.Ct. 2488 (2011), the Supreme Court vacated and remanded the Third Circuit's determination that a police chief's union grievances challenging his termination were protected speech under the Petition Clause, even if they related only to matters of private concern. *Id.* at 2492. The Supreme Court held that courts should uniformly "apply the public concern test developed in Speech Clause cases to Petition Clause claims by public employees." *Id.* at 2495. Thus, the Court vacated and remanded for a determination of whether the police chief's complaints constituted matters of public concern. *Id.* at 2501.

Plaintiff contends that the reason his speech was a matter of public concern was twofold. First, "speech [that] identifies wrongdoing on the part of persons exercising public authority is generally considered public concern." Pl. Opp. at 17. Second, "[w]hen the speech is made publicly or in judicial or administrative proceedings, it weighs in favor of finding that it is a matter of public concern." *Id.* at 18. Plaintiff's suit alleged that "promotions were halted to retaliate/discriminate against [him], that he was physically assaulted by a colleague in the BPD, that he was subjected to systematic, organized and corrupt abuses by his superior and fellow officers in the BPD, rising to the level of the Public Safety Director and Mayor[,] and that he was

15

terminated without justifiable reason." *Id.* at 19. Such conduct constitutes a matter of public concern according to Plaintiff.

In support of this contention, Plaintiff cites to *Fredericks v. Twp. of Weehawken*, 2012 U.S. Dist. LEXIS 163396 (D.N.J. Nov. 15, 2012). In *Fredericks*, the District Court found allegations that the mayor "subver[ted] . . . the political process and . . . assess[ed] illegal taxes . . ." to be obvious matters of public concern. *Id.* at *21. Plaintiff also cites cases in which various courts have found single incidents of racial or gender discrimination to be matters of public concern. *See, e.g., Montone v. City of Jersey City*, 709 F.3d 181, 186 (3d Cir. 2013); *Rode v. Dellarciprete*, 845 F.2d 1195, 1202 (3d Cir. 1988) ("Dismissing Rode's speech as unprotected merely because she had a personal stake in the controversy fetters public debate on an important issue because it muzzles an affected public employee from speaking out."). He further cites to *Azzaro v. County of Allegheny*, in which the Court stated that speech disclosing public officials' malfeasance is protected speech under the First Amendment since such information is "relevant in evaluating the performance of a public office or official." 110 F.3d 968, 978 (3d Cir. 1997) (internal quotations omitted). The *Azzaro* Court concluded that, "when [gender discrimination is] practiced by those exercising authority in the name of a public official, [it] is inherently a matter of public concern." *Id.*

Plaintiff distinguishes his case from those cited by Defendants by arguing that the level of wrongdoing alleged in Sgt. Burns' civil lawsuit and in his defense against the Quick Check allegations "clearly constitute matters of public concern, which would be of interest to the citizens and electorate of Bayonne." Pl. Opp. at 18. Further, regarding *Borough of Duryea v. Guarnieri*, he argues that allegations regarding "inappropriate conduct by public officials" make

Plaintiff's speech "far more important to the public than the alleged retaliation that Chief Guaranieri claimed in his lawsuit." *Id.* at 19.

Considering the "content, form and context" of the allegations contained in the state court complaints, the Court finds that Sgt. Burns has plausibly alleged that these communications constituted matters of public concern. *Connick*, 461 U.S. at 147-8. Regarding the content of the speech at issue, it had elements of both private and public concern. On the one hand, Plaintiff's speech brought to light potential misfeasance on the part of a number of high ranking public officials including the Chief of Police and the Director of Public Safety. (*See* FAC ¶¶ 6-7.) For example, Plaintiff alleged various "systematic, organized and corrupt abuses by his supervisors in the BPD," (FAC ¶ 45) including nepotism (FAC ¶¶ 37-44) and cronyism (FAC ¶ 16). It is well settled that speech that brings to light misfeasance on the part of public officials is a matter of public concern. *See, e.g., Azzaro*, 110 F.3d at 978; *Connick*, 461 U.S. at 148 (finding employee's speech not to constitute a matter of public concern because it did not, for example, "bring to light actual or potential wrongdoing or breach of public trust on the part of [the District Attorney] and others"). On the other hand, Plaintiff also alleged wrongdoing that was principally directed at himself. For example, Plaintiff alleged that he was "deliberately den[ied] . . . a promotion," was physically assaulted, and had "unwarranted disciplinary complaints . . . filed against him." (Am. Compl. ¶ 45.)

Next, the form of the speech was part of "a judicial proceeding, not a private conversation or letter or internal complaint. This favors finding the speech was a matter of public concern. . . ." *Marra v. Twp. of Harrison*, 913 F. Supp. 2d 100, 111 (D.N.J. 2012); *Sanguigni v. Pittsburgh Bd. of Pub. Educ.*, 968 F.2d 393, 399 (3d Cir. 1992) (suggesting that

speech made in a judicial proceeding weighs in favor of finding speech a matter of public concern).

Finally, although the context of Plaintiff's speech—filing suit after the BPD refused to abide by a settlement "which would have permanently enjoined the disciplinary charges arising from the Quick Check incident" (FAC ¶ 47) —weighs against finding the speech to constitute a matter of public concern, this factor is not dispositive. To the contrary, "*Connick* indicates that the speaker's motive, while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern." *Azzaro*, 110 F.3d at 978; *Rode*, 845 F.2d at 1201 ("Motivation [is] merely one factor to be considered, [and] not necessarily controlling, in assessing the character of the employee's speech."). In addition, "there is a substantial public interest in [Sgt. Burns'] revelations because they were relevant to an evaluation of the performance of the office of [public] official[s]." *Azzaro*, 110 F.3d at 980 (finding the public interest "to outweigh any legitimate countervailing governmental interest that might have been implicated. . ."). Therefore, at this stage of the litigation, the Court finds that Sgt. Burns has plausibly alleged that he spoke out on a matter of public concern.

### 2. Substantial Factor

To survive Defendants' motions to dismiss, Plaintiff must also show that his protected activity was a substantial factor in motivating the alleged retaliation. *See, e.g., Hill*, 411 F.3d at 125. Although this question is one of fact, the Court must dismiss a claim of retaliation if Plaintiff has failed to allege sufficient facts in support of this claim that would raise the required inference of a causal link between Plaintiff's exercise of his First Amendment rights ( i.e., his state court complaints) and the alleged retaliatory act ( i.e., his termination). *Morelli v. County of*

*Hudson*, 2011 U.S. Dist. LEXIS 23253, *9-10 (D.N.J. Mar. 7, 2011). A complaint must do more than allege a "mere possibility of misconduct." *See Iqbal*, 129 S.Ct. at 1950.

In the instant matter, Plaintiff alleges two facts that he contends are sufficient to raise an inference of a causal link between Plaintiff's protected activity and his termination. *See* Pl. Opp. 21. First, he points to two statements by Officer Kobryn, who is President of the PBA, and the City's PBA State Delegate Matt Lindquist. Allegedly, during a meeting with Officer Kobryn and Delegate Lindquist, they advised Sgt. Burns "that the reason he was ousted from the PBA was specifically his lawsuit, which he instituted and which they felt hurt the organization and its members as well as directly and specifically hurting Chief Kubert, Mayor Mark Smith and [himself – President Kobryn]." (FAC ¶ 76) (internal quotations omitted). Moreover, "[d]uring [this] conversation, Sgt. Burns confirmed with President Kobryn that the reason he was no longer a member of the PBA was because he sued the BPD[,] and both President Kobryn and Mr. Lindquist responded emphatically, 'Yeah, basically.'" (FAC ¶ 77). Second, Plaintiff points to the "unusually suggestive temporal proximity" between Plaintiff's return to patrol and the retaliatory action. He alleges that September 18, 2010 was the first time he returned to patrol since 2007, and that it was immediately following his first day back on patrol that he was informed that he was under investigation for an incident that occurred on September 18th and removed from duty. (FAC ¶ 69).

The Court finds that these facts are insufficient to raise an inference of a causal link between Plaintiff's protected activity and his termination. The statements by Officer Kobryn and Delegate Lindquist are related to the reason Plaintiff was ousted from his union, the PBA, and not why he was terminated from the BPD. Moreover, the temporal proximity, while suggestive, is not enough to raise an inference of a causal link in the instant matter because Plaintiff himself

alleges in his Complaint that, "[f]or three-and-a-half years prior to Sgt. Burns' return to patrol on September 18, 2010, Mayor Smith and others had been trying to remove Sgt. Burns from the BPD." (FAC ¶ 68). Thus, while Plaintiff alleges that Mayor Smith and Chief Kubert, among others, conspired to have him removed from the BPD, he does not sufficiently allege facts to raise the inference that it was in retaliation for his having filed a civil suit. As a result, Plaintiff has provided no facts to link his termination to his protected activity other than conclusory allegations of conspiracy. (*See, e.g.,* FAC ¶¶ 67, 90). These allegations fail to nudge Plaintiff's First Amendment claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 547; *Morelli,* 2011 U.S. Dist. LEXIS 23253, at * 9-10.

Therefore, the Court grants Defendants' motions to dismiss Plaintiff's § 1983 and NJCRA claims. The Court dismisses Plaintiff's Complaint without prejudice only to the extent Plaintiff is able to amend to include evidence of a causal link of retaliation.[3]

## IV. CONCLUSION

For the reasons set forth above, the Court finds dismissal warranted. Accordingly, it grants Defendants' motions and dismisses Plaintiff's Amended Complaint without prejudice. Plaintiff may amend within thirty days, or his Amended Complaint will be dismissed with prejudice.

An appropriate Order accompanies this Opinion.

Dated: March 31, 2014

José L. Linares
United States District Judge

---

[3] The Court notes that simply removing the allegation that "[f]or three-and-a-half years prior to Sgt. Burns' return to patrol on September 18, 2010, Mayor Smith and others had been trying to remove Sgt. Burns from the BPD," (FAC ¶ 68), will not be sufficient for Plaintiff to state a plausible retaliation claim by way of an amended complaint.

20