**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

PATRICK J. BURNS, III

                Plaintiff,

    v.

CITY OF BAYONNE, et al.,

                Defendants.

Civil Action No.: 12-6075 (JLL)

**OPINION**

**LINARES**, District Judge.

    This matter comes before the Court by way of four motions to dismiss Plaintiff Patrick J. Burns, III's ("Plaintiff" or "Sgt. Burns") Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (CM/ECF Nos. 72-77). No oral argument was heard pursuant to Federal Rule of Civil Procedure 78. The Court has considered the submissions and arguments made in support of and in opposition to the instant motions. For the reasons set forth below, Defendants' motions are denied.

## I. BACKGROUND

    On April 30, 2014 Sgt. Burns filed a Second Amended Complaint ("SAC") against the following defendants: (1) the City of Bayonne (the "City") (SAC ¶ 4); (2) the Bayonne Police Department ("BPD") (SAC ¶ 5); (3) Mark Smith, former Director of Public Safety and current Mayor of the City of Bayonne and supervisor of Plaintiff ("Mayor Smith") (SAC ¶ 6); (4) Plaintiff's direct supervisor, BPD Chief Robert Kubert ("Chief Kubert") (SAC ¶ 7); (5) Captain Peter Nevins, an officer with the BPD and Captain of the Internal Affairs Division ("Capt. Nevins") (SAC ¶ 8); (6) Lieutenant Timothy Farrell, an officer with the BPD and a member of the

Internal Affairs Division ("Lt. Farrell") (SAC ¶ 9); (7) Officer William Kobryn, a member of the BPD and President of the Bayonne Chapter of the PBA ("Officer Kobryn") (SAC ¶ 10); (8) Director of Public Safety Jason O'Donnell (SAC ¶ 11); and (9) John Does 1-10.

As per Plaintiff's Second Amended Complaint, this action arises out of the alleged "illegal discharge" of Plaintiff Burns from his position as a Sergeant with the BPD. (CM/ECF No. 70 ¶ 1) ("SAC"). The Complaint alleges that as of 1995, when Plaintiff began working for the BPD, he was subject to physical and verbal abuse and ridicule by members of the BPD. (SAC ¶¶ 13-14). Plaintiff alleges that the BPD twice improperly sought his termination.

The first time BPD sought Plaintiff's termination was as a result of the so-called "Quick Check incident." Plaintiff alleges that while on duty in 2006, he observed an individual under the influence of alcohol in a Quick Check store. (SAC ¶ 31). The salesperson asked Plaintiff to remove this individual from the establishment. (SAC ¶ 32). When the individual refused to leave and cursed at Plaintiff, Plaintiff escorted him out of the store. (SAC ¶ 33). It was at this point that the individual informed Plaintiff that he was Captain Murphy's nephew. (SAC ¶ 34). The following day, Captain Murphy confronted Plaintiff about the incident and demanded he apologize to his nephew. (SAC ¶ 36).

The next day, Captain Murphy's nephew signed a complaint at police headquarters alleging that he was assaulted by Plaintiff. (SAC ¶ 37). Plaintiff claims that Captain Murphy met privately with his nephew prior to the interview and was present during the interview, in violation of BPD policy. (SAC ¶ 38). As a result of the complaint, Plaintiff was placed on "intensive supervision." (SAC ¶ 39). Plaintiff alleges that he was the only Sergeant ever placed on extended intensive supervision. (SAC ¶ 40).

Further, Plaintiff alleges that BPD sent the surveillance video from the Quick Check incident to the prosecutor's office "seeking to have criminal charges brought against [Plaintiff]." (SAC ¶ 42). Despite the prosecutor's office finding no basis for an assault charge and having "refused involvement," Plaintiff claims that on April 14, 2007 BPD brought fourteen charges against him as a result of the incident, including physical assault on Captain Murphy's nephew. (SAC ¶ 43). What is more, Plaintiff alleges that he ultimately learned from an unnamed member of the Internal Affairs Division, that Mayor Smith advocated for the disciplinary proceedings related to the Quick Check incident and was seeking Sgt. Burns' termination. (SAC ¶ 44).

On July 24, 2008, Plaintiff filed a lawsuit in New Jersey state court against the City, BPD, and numerous other individuals, including Mayor Smith and Chief Kubert. (SAC ¶ 45). According to Plaintiff, his complaint alleged: (1) "that he had been subject to systematic, organized and corrupt abuses by his superiors and fellow officers in the BPD"; (2) "that he had been subject to systematic, organized and corrupt abuses by his superiors and fellow officers in the BPD"; (3) "that promotions were halted for a three-year period, even though eight positions were available, to deliberately deny Sgt. Burns a promotion, who was number one on the effective list"; (4) "that he had been physically assaulted by a fellow officer"; (5) "that unwarranted disciplinary complaints were filed against him; and (6) "that Sgt. Burns' personal firearms were confiscated by BPD in violation of his constitutional rights." *Id.* The complaint also "sought to enforce a global settlement between Sgt. Burns and the defendants, which would have permanently enjoined the disciplinary charges arising from the Quick Check incident." *Id.* In August 2009, Plaintiff's state court claims were dismissed by way of summary judgment in favor of Defendants. (SAC ¶ 47).

Nearly a year later, in September 2009, BPD's hearing officer found Plaintiff guilty of assault on Captain Murphy's nephew. (SAC ¶ 48). Plaintiff received a Final Notice of

Disciplinary Hearing and was terminated. *Id.* Plaintiff appealed his termination to the Office of Administrative Law ("OAL"). In March 2010, the Honorable JoAnn LaSala Candido, A.L.J. ordered that Plaintiff be reinstated with full back pay and seniority and reimbursement of insurance premiums. (SAC ¶¶ 49, 54). After Chief Kubert and Mayor Smith continued to refuse to reinstate Plaintiff, the Civil Service Commission affirmed Judge Candido's decision and ordered the City to reinstate Plaintiff within ten days or be subject to a fine. (SAC ¶¶ 53-55). Plaintiff alleges that upon information and belief, Mayor Smith, Chief Kubert and Director O'Donnell had several meetings to discuss preventing Sgt. Burns' return to BPD. (SAC ¶ 56).

Plaintiff was reinstated on August 30, 2010, but did not return to patrol until September 18 of that year. (SAC ¶ 58). Plaintiff did not return to patrol immediately after being reinstated because he was obtaining the necessary qualifications and licensing in order to return to patrol. (SAC ¶ 59). It was during Plaintiff's qualifying at the shooting range, that Plaintiff was allegedly advised by the officer in charge: "Once you get on the street, keep your head low and under the radar, because they are hunting for you. Bets are on as to how long it will be before they bring you up on charges and kick your ass out the door." (SAC ¶ 64). Plaintiff alleges that when he asked why, the officer responded, "You cannot expect to sue the whole department and have them take you back with no reprisals." *Id.* Plaintiff alleges that the officer was referring to the Plaintiff's prior lawsuit against the City, the BPD, Mayor Smith and Chief Kubert. *Id.*

Plaintiff further alleges that on or about August 30, 2010, when Plaintiff reported to the Captain in charge of planning and training, Plaintiff was informed that he was under the direct authority of Chief Kubert and that Chief Kubert was going to personally direct Plaintiff's deployment. (SAC ¶ 61). Moreover, Plaintiff asserts that he was denied his requested duty shift, despite his seniority as a sergeant. *Id.* Regarding the City, Plaintiff alleges that Bayonne further

4

denied his cost of living increases, back pay cost of living increases and to date has not paid the required six (6) months of back pension as order by Judge Candido in Civil Service, thereby effecting Plaintiff's overall pension benefits, retirement pay and his entitled retirement package. (SAC ¶ 62). Additionally, Plaintiff also contends that he was advised by another Captain that there was "bad karma" in the department as a result of Plaintiff's prior lawsuit. (SAC ¶ 63).

Plaintiff alleges that on September 18, 2010, during Plaintiff's first shift on Patrol since his reinstatement, Plaintiff encountered a motor vehicle whose driver was acting suspiciously and driving erratically. (SAC ¶ 66). Plaintiff contends that at the end of this incident it was determined that the driver of the motor vehicle was a drug distributor who was in the process of conducting a drug delivery when Plaintiff observed him. *Id.* The driver was allegedly a "five (5) time convicted drug dealer and had recently been released from New Jersey State Prison after serving a ten (10) year drug distribution sentence."  (FAC ¶ 68).  Plaintiff alleges that "[d]espite the successful apprehension of a known felon, Sgt. Burns' supervisors claimed that he did not, 'call the chase into headquarters in a timely fashion,' use appropriate radio protocol or follow pursuit guidelines." (FAC ¶ 69).  Further, "[d]uring the episode, [he] was attempting to contact dispatch. The episode was thirty (30) seconds long: twenty-six (26) of those seconds were Sgt. Burns attempting to contact dispatch and four (4) of those seconds were dispatch communicating with Sgt. Burns." (SAC ¶ 70).

Plaintiff alleges that based upon information and belief, Mayor Smith, Chief Kubert and Director O'Donnell conspired to have Plaintiff removed from the BPD immediately upon his return to patrol and intended to use the September 18, 2010 chase as a pretext. (SAC ¶ 71). Plaintiff further alleges that for 3 ½ years prior to Plaintiff's return to patrol on September 18, 2010, Mayor Smith and others refused to allow Plaintiff to perform the duties of a patrol sergeant with the BPD.

(FAC ¶ 72). Following the September 18, 2010 incident, Plaintiff alleges that he was notified that he was under an investigation for the same incident and removed from patrol. (FAC ¶ 73). Allegedly, Captain Nevins immediately directed Plaintiff to report to the traffic division and ordered Plaintiff not to wear his uniform to this assignment. (SAC ¶ 74). Plaintiff contends that the BPD's table of organization listed this assignment as a uniformed position, thereby making Plaintiff the only officer not in uniform. *Id.*

Upon arrival to the traffic division Plaintiff alleges that he was informed by the commander that the commander's specific request that Plaintiff be permitted to drive a departmental vehicle was denied, to which the commander allegedly told Plaintiff he had never been given these instructions in any other circumstance. (SAC ¶¶ 75-76). The commander also allegedly informed Plaintiff that he had "gone to bat" for Plaintiff, but Mayor Smith, Director O'Donnell, Chief Kubert and Captain Nevins were "pissed." (SAC ¶ 76). Plaintiff also allegedly had two statements made to him from other officers. (SAC ¶ 77). The first alleged statements was: "This is bullshit, they sent you down here with the 'Land of Misfit Toys' until they can get rid of you." *Id.* The second statement allegedly indicated that Mayor Smith, Chief Kubert and Captain Nevins were uncomfortable and "realize that they better get (Plaintiff) before (Plaintiff) gets them." *Id.*

Plaintiff alleges that BPD forwarded the September 18, 2010, incident to the Prosecutor's office for review seeking to bring Plaintiff up on criminal charges that would result in his automatic termination, but after reviewing the evidence, the Prosecutor's office exonerated Plaintiff of any wrongdoing. (SAC ¶¶ 79, 81). It is Plaintiff's position that upon information and belief that in past similar circumstance and with more serious issues, the BPD has refused to forward evidence to the Prosecutor's office. (SAC ¶ 80).

Plaintiff contends that in mid-October, 2010, he was allegedly informed that "'[he] was no longer a member of the PBA and had no recourse.'" (SAC ¶ 82). [1]  Plaintiff asserts that he met with PBA President Officer Kobryn, PBA Treasurer Ken Maak, the City's PBA State Delegate Matt Lindquist and Lieutenant Neil Ward in or around October 2010. (SAC ¶ 73).  Plaintiff also asserts that he was told that "the reason he was 'ousted' from the PBA was specifically his lawsuit, which he instituted and which they felt 'hurt the organization and its members as well as directly and specifically hurting Chief Kubert, Mayor Mark Smith and [Officer Kobryn].'" (SAC ¶ 84). Further, "[d]uring the above-referenced conversation, Sgt. Burns confirmed with President Kobryn that the reason that he was no longer a member of the PBA was because he sued the BPD . . . .[B]oth President Kobryn and Mr. Lindquist responded emphatically, 'Yeah, basically.'" (SAC ¶ 85).

Further, Sgt. Burns declares that "President Kobryn, the PBA and the BPD knew in March, April, and May that Sgt. Burns would be returning to work, while they maliciously refused to make any payments or keep him in good standing with his local union, thereby denying him the benefits entitled to members of the PBA." (SAC ¶ 86).  Because of this, "Sgt. Burns was not covered under the State PBA Legal Protection Plan for the time-frame in which the September 18, 2010 incident occurred, causing Sgt. Burns to hire a PBA attorney at his own personal costs for legal representation." (SAC ¶ 87).  Plaintiff additionally alleges that his "ousting" was in direct violation of the state rules and regulations and Local PBA By-Laws and [that] President Kobryn was directed by the State Delegate to immediately reinstatement [him]." (SAC ¶ 89).  During a subsequent meeting with Plaintiff, Officer Kobryn allegedly stated that "even though he was being ordered to reinstate Sgt. Burns in the PBA, [] the PBA would not pay for his legal fees related to

---

[1] Although the Complaint does not define the term PBA, Plaintiff is likely referring to the Policemen's Benevolent Association.

the September 18, 2010 incident and would immediately start proceedings to have him removed from the PBA." (SAC ¶ 89).

On November 19, 2010, Captain Nevins, Lt. Farrell and Director O'Donnell allegedly told Plaintiff that he was being suspended immediately, without pay, pending the outcome of his departmental trial. (SAC ¶ 90). The purported reasons for the suspension were that Plaintiff was a danger to himself and the public. (SAC ¶ 92). Plaintiff then asked who decided that he was a danger to himself and the public. (FAC ¶ 93). Director O'Donnell responded that he was the one who made the determination and allegedly added, "You don't think you could do what you did to us and have no blowback, did you?" *Id.* Plaintiff alleges that, upon information and belief, no other officer has ever been suspended without pay without a prior departmental hearing. (SAC ¶ 95). He claims that only three officers have ever been dismissed for disciplinary reasons: one for drug offenses and the other two for aggravated assault and weapons offenses. (SAC ¶ 96). Plaintiff maintains that his "treatment was a direct [] result of having filed a civil complaint against the City, Mayor Smith and Chief Kubert[,] and having challenged his termination following the Quick Check incident." (SAC ¶ 97).

Plaintiff alleges that "[a]n unprecedented investigation of [him] followed, with the sole purpose to create justification for his termination." (SAC ¶ 98). He claims that "the investigation and report of the September 18, 2010 incident relied on false and inaccurate representations of the record, even contradicting itself as to the allegations contained therein." (SAC ¶ 99). Plaintiff further claims that Lt. Farrell and Capt. Nevins were responsible for some of the some alleged falsities and inconsistencies. (SAC ¶ 100). Specifically, Plaintiff alleges that Captain Nevins testified before the OAL, that no one had heard Plaintiff calling headquarters and he approved a report that found that Plaintiff had failed to call headquarters, despite two (2) sergeants, one (1)

detective and three (3) patrol officers submitting written reports testifying otherwise. (SAC ¶ 101). He also alleges that the video footage from his patrol car disproved BPD's allegations that "he failed to follow appropriate procedures by running a red light and almost striking two civilians." (SAC ¶ 102). In fact, he alleges that the footage "showed that the alleged []red light[] was []green[] and that the civilians [he] allegedly endangered never altered their conduct as a result of the pursuit and were never in any danger." *Id.*

Plaintiff also claims that BPD told the Prosecutor's Office to make the drug charges against the driver Plaintiff arrested on September 18, 2010 "'go away.'" (SAC ¶ 104). Plaintiff asserts that when the Prosecutor issued a grand jury subpoena for Plaintiff regarding the case, the Prosecutor was advised by Internal Affairs that Plaintiff was no longer employed by BPD, despite the fact Plaintiff had not been terminated and was available. (SAC ¶ 104). He alleges that "[i]n order to remove [him] from the BPD, the highest levels of BPD and the City[] refused to prosecute a convicted felon and drug dealer." (SAC ¶ 106).

On February 14, 2011, following a departmental trial, Sgt. Burns allegedly received a Final Notice of Discipline by the BPD and was immediately terminated. (SAC ¶ 107). Plaintiff asserts that he has recently learned that the hearing officer at his departmental hearing was precluded from presiding as a hearing officer in Hudson County as a matter of law. (SAC ¶ 108). Plaintiff alleges that "[s]ince his termination, several members and formal members of the BPD have advised [him] that he was railroaded and that he should have known that he could not fight 'City Hall.'" (SAC ¶ 109). Further, Plaintiff contends that he recently "ran into" a Captain in the BPD, who advised Plaintiff that the alleged actions by Mayor Smith, Director O'Donnell, Chief Kubert and Captain Nevins were "downright wrong, malicious and a clear example of selective enforcement." (SAC ¶

110). The Captain allegedly further advised Plaintiff that the entire midnight shift had violated the Attorney General's Pursuit Guidelines, during a chase without any repercussions. (SAC ¶ 111).

The First Amended Complaint asserts the following causes of action: (1) 42 U.S.C. § 1983 – First Amendment; (2) 42 U.S.C. § 1983 – *Monell* Liability; and (3) "New Jersey Civil Rights Act, N.J.S.A. 10:6-1 *et. seq.* NJ Constitution."

The following defendants filed motions to dismiss Plaintiff's Complaint: (1) Capt. Nevins and Lt. Farrell (CM/ECF No. 77); (2) Officer Kobryn (CM/ECF No. 72); (3) Mayor Smith and Director of Public Safety Jason O'Donnell (CM/ECF No. 76); and (4) the City, Chief Kubert, and the BPD (CM/ECF No. 73).

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." For a complaint to survive dismissal, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff's short and plain statement of the claim must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 545 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

In evaluating the sufficiency of a complaint, a court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the non-moving party. *See Phillips v. Cnty. Of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Further, "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.'  Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

## III. DISCUSSION

### A.  The Motions Before the Court[2]

#### 1.  Capt. Nevins and Lt. Farrell

Capt. Nevins and Lt. Farrell (collectively "IA Defendants" or "Internal Affairs Defendants") assert that the action should be dismissed as to them because: (1) The Second Amended Complaint lack facial plausibility as the Plaintiff has failed to establish that his protected activity was a substantial factor in motivating the alleged retaliation; (2) The Second Amended Complaint is merely an attempt to collaterally attack, impair and relitigate the underlying adverse employment proceedings and as such, is barred by the doctrine of Collateral Estoppel; (3) The Plaintiff's Second Amended Complaint fails to state a claim for relief, pursuant to 42 U.S.C. § 1983, as the Plaintiff has failed to show that the IA Defendants personally participated in or had knowledge of and acquiesced in the allegedly unlawful conduct; and (4) The IA Defendants are entitled to Qualified Immunity as their conduct did not violate clearly established statutory or constitutional  rights. (CM/ECF No. 77-3).

#### 2.  Director of Public Safety and Jason O'Donnell and Mayor Smith

Defendant Mayor Smith, who is the current Mayor of the City of Bayonne and a former police officer and Director of Public Safety, and Jason O'Donnell, the current director of Public Safety, assert that the Second Amended Complaint should be dismissed in light of the following:

---

[2] Officer Kobryn joins the motion to dismiss filed by all defense counsel. (CM/ECF No. 72-2).

(1) The Second Amended Complaint fails to set forth a plausible claim of retaliation; (2) Plaintiff is estopped from relitigating the reasonableness of his prior discipline, (3) Defendants are entitled to qualified immunity; and (4) the Complaint is barred by the Doctrines of Res Judicata, Entire Controversy, and Collateral Estoppel. (CM/ECF. No. 76-1).

### 3. The City, Chief Kubert, and the BPD

The City, Chief Kubert, and the BPD (collectively "City Defendants") make the following arguments in their motion to dismiss the Second Amended Complaint: (1) The Court should dismiss Plaintiff's time barred claims; and (2) The Court should dismiss the complaint as Plaintiff has utterly failed to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12 (b)(6). (CM/ECF No. 78).

### 4. Officer Kobryn

Officer Kobryn makes the following arguments in support of his motions to dismiss: (1) Plaintiff's Second Amended complaint fails to meet the federal pleading requirements; (2) Plaintiff has not alleged a constitutional claim; and (3) Res Judicata and Collateral Estoppel warrant dismissal of Plaintiff's Second Amended Complaint. (CM/ECF No. 72-1).

### 5. Plaintiff's Opposition

In opposition to the instant motion, Plaintiff argues: (1) Plaintiff's claims are not barred by the applicable two year statute of limitations; (2) Plaintiff has alleged constitutional claims sufficient to sustain causes of action pursuant to § 1983 and the New Jersey Civil rights act; and (3) Res Judicata, Collateral Estoppel and the Entire Controversy Doctrine are inapplicable. (CM/ECF No. 86).

**B.  Statute of Limitations**

Defendants argue that Plaintiff's § 1983 claim is barred by the relevant statute of

limitations because his Complaint includes allegations dating back to 1995.  Defendants may

prevail on the statute of limitations at the motion to dismiss stage if it is apparent from the face

of the complaint that the cause of action is barred.  *Robinson v. Johnson*, 313 F.3d 128, 135 (3d

Cir. 2002) (citation omitted).  "If the allegations, taken as true, show that relief is barred by the

applicable statute of limitations, a complaint is subject to dismissal for failure to state a claim."

*Cain v. Dep't of Pub. Welfare*, 442 F. App'x. 638 (3d Cir. 2011) (citing *Jones v. Bock*, 549 U.S.

199, 215 (2007); *Bethel v. Jendoco Constr. Corp.*, 570 F.2d 1168, 1174 (3d Cir. 1987)).

The applicable statute of limitations for a claim brought under § 1983 is that of a personal

injury claim in the state in which the claim arises.  *Owens v. Okure*, 488 U.S. 235, 249-50

(1989); *Cito v. Bridgewater Twp. Police Dep't*, 892 F.2d 23, 25 (3d Cir. 1989).  Under New

Jersey law, a personal injury claim must be brought within two years of the date of accrual.

N.J.S.A. 2A:14-2.  Therefore, the statute of limitations for § 1983 claims in New Jersey is two

years.  *Cito*, 892 F.2d at 25; *O'Connor v. City of Newark*, 440 F.3d 125, 126-27 (3d Cir. 2006).

Similarly, the parties agree that civil rights claims brought under New Jersey's Civil Rights Act

are also subject to a two-year statute of limitations.  *Brown v. City of Newark*, 2010 U.S. Dist.

LEXIS 40564, 2010 WL 1704748, at * 4 (D.N.J. Apr. 26, 2010); *Gibson v. Superintendent of

N.J. Dep't of Law & Pub. Safety*, Civ. No. 02-5470, 2007 U.S. Dist. LEXIS 22871, at *3 (D.N.J.

Mar. 29, 2007).  Under federal law, a § 1983 cause of action accrues when the allegedly

wrongful act occurred.  See *Wallace v. Kato,* 549 U.S. 384, 388 (2007) ("It is 'the standard rule

that accrual occurs when the plaintiff has a complete and present cause of action, that is, when

'the plaintiff can file suit and obtain relief.'") (internal citations and alterations omitted).

As this Court stated in its previous Opinion (CM/ECF No. 68), the instant action was filed on September 27, 2012. (CM/EFC No. 1). Plaintiff was suspended on November 19, 2010 and terminated on February 4, 2011. (SAC ¶¶ 90, 107). This Court held that "Plaintiff's claims consequently fall within the relevant two-year period and are not time barred." (CM/ECF No. 68 at 11). Therefore, per this Court's previous decision, the Defendant's motions to preclude Plaintiff's claims on a statute of limitations basis are denied.

## C. First Amendment Retaliation Claim

### 1. Matter of Public Concern

Plaintiff brings his claims under § 1983, which provides civil remedies against any person who, under color of state law, deprives another of rights protected by the United States Constitution, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2.  Section 1983, does not, by itself, confer any substantive rights, it only serves to enforce rights granted under the Constitution or federal law.  *Mayer v. Gottheiner*, 382 F. Supp. 2d 635, 646-47 (D.N.J. 2005). Here, Plaintiff claims a violation of the First Amendment because Defendants allegedly retaliated against him for pursuing a civil lawsuit and challenging his termination after the Quick Check incident.  (FAC ¶¶ 107, 115).  "To state a First Amendment retaliation claim, a plaintiff must allege two things: (1) that the activity in question is protected by the First Amendment, and (2) that the protected activity was a substantial factor in the alleged retaliatory action." *Hill v. Borough of Kutztown*, 455 F.3d 225, 241 (3d Cir. 2006).

This Court held in its previous Opinion (CM/ECF No. 68), that Plaintiff has met the burden of plausibly alleging that he spoke out on a matter of public concern, which is an activity protected by the First Amendment. *Id.* at 18. Therefore, the Court will only address whether

14

Plaintiff has met the burden of plausibly alleging that the protected activity was a substantial factor in the alleged retaliatory action.

### 2. Substantial Factor

To survive Defendants' motions to dismiss, Plaintiff must also show that his protected activity was a substantial factor in motivating the alleged retaliation.  See, e.g., *Hill*, 411 F.3d at 125.  Although this question is one of fact, the Court must dismiss a claim of retaliation if Plaintiff has failed to allege sufficient facts in support of this claim that would raise the required inference of a causal link between Plaintiff's exercise of his First Amendment rights ( i.e., his state court complaints) and the alleged retaliatory act ( i.e., his termination).  *Morelli v. County of Hudson*, 2011 U.S. Dist. LEXIS 23253, *9-10 (D.N.J. Mar. 7, 2011).  A complaint must do more than allege a "mere possibility of misconduct."  See *Iqbal*, 129 S.Ct. at 1950.

In the instant matter, Plaintiff alleges several new facts in his amended complaint that he contends are sufficient to raise an inference of a causal link between Plaintiff's protected activity and his termination. *See* Pl. Opp. at 21. First, Plaintiff asserts that upon his return, BPD took the unusual step of placing him under the direct authority of Chief Kubert, who would personally direct Plaintiff's deployment. (SAC ¶ 61). Moreover, Plaintiff alleges that he was denied his requested duty shift, despite his seniority as a sergeant. *Id.* Plaintiff contends that the City also denied Plaintiff of his cost of living increases, back pay cost of living increases and the required six (6) months of back pension payments as ordered by Judge Candido in Civil Service. (SAC ¶ 62). Plaintiff alleges that this affected his overall pension benefits, retirement pay and his entitled retirement package. *Id.* Second, Plaintiff alleges that Director O'Donnell advised plaintiff after his suspension following the September 18, 2010 incident, "you didn't think you could do what you did to us and have no blowback, did you?" (SAC ¶ 93).

Third, Plaintiff alleges several statements made to him by members of the BPD regarding his relationship with the Defendants. Plaintiff states that he was informed by fellow officers that there was "bad karma" in the department as a result of his prior lawsuit. (SAC ¶ 63). Plaintiff also alleges that a fellow officer told him "once you get on the street, keep your head low and under the radar, because they are hunting for you. Bets are on as to how long it will be before they bring you up on charges and kick your ass out the door." (SAC ¶ 64). Plaintiff allegedly asked "why?" and was told by the same officer, "you cannot expect to sue the whole department and have them take you back with no reprisals." *Id.* Plaintiff further alleges that the commanding officer of the traffic division advised Plaintiff that he had been ordered to not permit Plaintiff operate any departmental vehicle, an order he had never received in the past. (SAC ¶ 76). The same officer allegedly advised Plaintiff that he had "gone to bat" for Plaintiff, but Mayor Smith, Director O'Donnell, Chief Kubert, and Captain Nevins were "pissed." *Id.* Finally, Plaintiff alleges that a Captain in the BPD advised Plaintiff "what Mayor Smith, Director O'Donnell, Chief Kubert, and Captain Nevins did to [Plaintiff] was 'downright wrong, malicious, and a clear example of selective enforcement.'" (SAC ¶ 110).

Plaintiff also alleges two facts that he contends are sufficient to raise an inference of a causal link between Plaintiff's protected activity and his termination that he also relied upon in the First Amended Complaint. *See* Pl. Opp. at 23. First, he points to two statements by Officer Kobryn, who is President of the PBA, and the City's PBA State Delegate Matt Lindquist. Allegedly, during a meeting with Officer Kobryn and Delegate Lindquist, they advised Sgt. Burns "that the reason he was ousted from the PBA was specifically his lawsuit, which he instituted and which they felt hurt the organization and its members as well as directly and specifically hurting Chief Kubert, Mayor Mark Smith and [himself – President Kobryn]." (SAC

¶ 84) (internal quotations omitted).  Moreover, "[d]uring [this] conversation, Sgt. Burns confirmed with President Kobryn that the reason he was no longer a member of the PBA was because he sued the BPD[,] and both President Kobryn and Mr. Lindquist responded emphatically, 'Yeah, basically.'"  (SAC ¶ 85).  Second, Plaintiff points to the "unusually suggestive temporal proximity" between Plaintiff's return to patrol and the retaliatory action.  He alleges that September 18, 2010 was the first time he returned to patrol since 2007, and that it was immediately following his first day back on patrol that he was informed that he was under investigation for an incident that occurred on September 18th and removed from duty.  (FAC ¶¶ 65, 73).

The Court finds that these facts are sufficient to raise an inference of a causal link between Plaintiff's protected activity and his termination. The alleged statements made by Director O'Donnell, coupled with the alleged information received by Plaintiff through various members of the BPD are related to the reason why Plaintiff was terminated from the BPD. Plaintiff has alleged that he was suspended without pay, subject to a biased investigation resulting in his termination, and subject to various acts by Defendants that do not meet standard protocol within the BPD. Further, by alleging statements that directly attribute Plaintiff's termination to his filing of the civil lawsuit against Defendants, Plaintiff has linked the alleged acts to the alleged statements made to Plaintiff. Coupled with the suggestive temporal proximity between the protected activity and the adverse action, these allegations nudge Plaintiff's First Amendment claim "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 547; *Morelli*, 2011 U.S. Dist. LEXIS 23253, at * 9-10.

**D.  Monell Liability Claim**

Count Two of the Second Amended Complaint alleges 42 U.S.C. § 1983 *Monell* liability against the City and BPD. In *Monell v. Dep't of Social Services,* the United States Supreme Court held that:

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible § 1983.

*Monell,* 436 U.S. 658, 694 (1978).

The Supreme Court has also concluded that *Monell* liability only attaches where "the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Pembaur v. Cincinnati,* 475 U.S. 469, 482 (1986). Moreover, the Court held that §1983 municipal liability attaches only where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id. at 483.*

Defendants argue that Plaintiff has failed to allege any policy or custom of the city or BPD that deprived Plaintiff of his rights. Defendants assert that Plaintiff merely alleges conclusory statements that do not garner enough weight to meet the federal pleading requirements. Defendants rely on *Beck v. City of Pittsburgh* to establish that a plaintiff must show that the decisionmakers were aware of an implemented, unlawful policy, but failed to take precautions against future violations, which ultimately lead to the plaintiff's injury. *Beck,* 89 F.3d 966, 972 (3d Cir. 1996) (Citation Omitted).

Plaintiff argues that his termination was made with the approval of Mayor Smith, Director O'Donnell and Chief Kubert, who Plaintiff contends represent the highest level of government in the city. Plaintiff stresses that the actions were made by individuals with "final decision and policy making authority", which represented the official policies of the city and BPD. Plaintiff argues that these actions, united with the statements made by members of the BPD, as well as Director O'Donnell himself, rise to a level sufficient to comply with the federal pleading requirements.

The Court finds that facts alleged by Plaintiff in regards to *Monell* liability are sufficient to survive Defendants' motion to dismiss. Plaintiff alleges that Defendants took several courses of action against him that were beyond normal protocol within the BPD including: allegedly ordering Plaintiff to a uniformed position, but not allowing him to wear a uniform; allegedly refusing to reinstate Plaintiff for more than four (4) months despite being ordered to do so by the Civil Service Commission; allegedly not allowing Plaintiff to drive a departmental vehicle despite this never giving the commanding officer this instruction in the past; Chief Kubert allegedly requiring Plaintiff to turn in all of his equipment including his Police Identification, despite never requiring another officer to do this in similar situations; and allegedly forwarding the September 18, 2010 incident to the Prosecutor's office for review, despite not forwarding more serious matters to the Prosecutor.

These courses of action taken by the Defendants, who had final decision making authority within the City and the BPD, combined with the various statements made to the Plaintiff by members of the BPD, as well as the Defendants themselves, are sufficient to allow additional development in discovery. Therefore, Defendants' motion to dismiss Plaintiff's claim of *Monell* liability is denied.

19

### E. Qualified Immunity

The Defendants, in their individual capacity, move to have Plaintiff's Second Amended Complaint dismissed on the basis of qualified immunity. Government officials are entitled to qualified immunity under § 1983 if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (citation omitted); see also *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir.2002) (citation omitted). The Supreme Court has repeatedly emphasized the importance of resolving immunity questions at the earliest possible stages of litigation. *Pearson*, 555 U.S. at 232; *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). Defendants bear the burden of establishing that they are entitled to qualified immunity. *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir.1989) (citing *Ryan v. Burlington Cnty.*, 860 F.2d 1199, 1204 n. 9 (3d Cir.1988), cert denied, 490 U.S. 1020, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989)).

Although not mandatory, Courts may apply a two (2) part test, known as the *Saucier* procedure, in order to determine if qualified immunity is applicable. "Because the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking that will best facilitate the fair and efficient disposition of each case." *Pearson*, 555 U.S. 223, 242, 129 S. Ct. 808, 821, 172 L. Ed. 2d 565 (2009) This Court determines that the *Saucier* procedure is appropriate in this matter.

First, the court must address whether "the officer's conduct violated a constitutional right[.]" *Saucier,* 533 U.S. 194, 201, 121 S. Ct. 2151, 2153, 150 L. Ed. 2d 272 (2001). If, and only if, the court finds a violation of a constitutional right, the court should then determine whether the right was clearly established. In other words, "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

Plaintiff argues that because this Court has already held that Plaintiff has an established constitutional right to complain pursuant to the First Amendment, the only question to be determined by the Court is whether the individual Defendants were personally involved, directed others, or knowingly acquiesced in the illegal retaliatory conduct. Plaintiff asserts that by allegedly refusing to reinstate Plaintiff to BPD after being ordered to do so by the Civil Service Commission; being suspended without hearing unlike any previous sergeant; the filing of baseless charges against Plaintiff; requiring Plaintiff to turn in all of his police equipment unlike any previous sergeant; not allowing Plaintiff to wear his uniform to his assigned "uniform" division; conducting a flawed investigation against Plaintiff; and illegally removing Plaintiff from the "PBA" because he filed a civil suit against the BPD, it was reasonably clear to Defendants that their conduct violated a clearly established right.

Each Individual Defendant counters Plaintiff with his own argument. Officer Kobryn states that Plaintiff's constitutional right was not clearly established. Therefore, Plaintiff cannot establish a causal link of retaliation by Officer Kobryn. Chief Kubert argues that Plaintiff provides no facts describing how Chief Kubert allegedly violated his constitutional rights. Defendants Smith and O'Donnell argue that their conduct cannot be deemed to have violated Plaintiff's constitutional right because both an Administrative Law Judge and the Civil Service Commission determined that the Plaintiff's termination was lawful and proper. The IA

Defendants argue that there conduct was deemed proper by the Administrative Law Judge and the Civil Service Commission, as well.

Taking Plaintiff's allegations as true, the Court finds, at this stage of the litigation, all of the individual Defendants are not entitled to qualified immunity. The Court has already indicated that Plaintiff has established a constitutional right to complain pursuant to the First Amendment. The Court now determines that the Plaintiff has sufficiently plead facts that allow the Court to draw the reasonable conclusion that the Defendants were aware that their actions clearly violated the established right. Plaintiff has alleged that Defendants knowingly engaged in activities that were not a part of normal BPD protocol. Being high ranking officers of the City, BPD, and PBA, the Court believes it fair to state that a reasonable officer in the Defendants' situation should have believed that their actions were a violation of the Plaintiff's rights.  Moreover, Plaintiff has alleged that Defendants acknowledged their own behavior by stating themselves that the actions taken against Plaintiff were in reprisal for the civil suit Plaintiff filed against Defendants. Therefore, Plaintiff has sufficiently plead facts to defeat Defendants' motion to dismiss based on qualified immunity, at this stage of the litigation.

## F.  Res Judicata, Collateral Estoppel, and the Entire Controversy Doctrine

Defendants argue that Plaintiff's claim is barred by Res Judicata, Collateral Estoppel, and New Jersey's Entire Controversy Doctrine. Specifically, Defendants state that Plaintiff's claims are merely an attempt to relitigate claims that have already been decided in Plaintiff's OAL hearing and later affirmed by the Civil Service Commission. What is more, Defendant's argue that because Plaintiff had the opportunity to raise a First Amendment retaliation claim, but failed to do so, he should now be barred from bringing the claim in the instant action. Defendants rely on *Winters v. North Hunterdon Fire & Rescue,* 212 *N.J.* 67, 73, 50 A.3d 649 (2012), which

22

articulates the proposition that when a public employer-employee dispute is legally adjudicated and the employee claims that the adverse disciplinary action was retaliatory, then both parties must "live with the outcome, including its potential preclusive effect on related employment-discrimination litigation as a matter of equitable application of estoppel principles." *Id.* Plaintiff responds to this argument by attempting to distinguish the case by arguing that the plaintiff in *Winters* raised the issue of retaliation in his departmental hearings, whereas Plaintiff did not.

When a state agency acts in a judicial capacity in order to resolve issues of fact before it in which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts. *Univ. of Tennessee v. Elliott*, 478 U.S. 788, 799, 106 S. Ct. 3220, 3226, 92 L. Ed. 2d 635 (1986). However, although administrative estoppel is favored as a matter of general policy, its application may vary according to the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures. *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 109-10, 111 S. Ct. 2166, 2170, 115 L. Ed. 2d 96 (1991).

This issue was specifically addressed by the Third Circuit in *Edmundson v. Borough of Kennett Square*, 4 F.3d 186, 189 (3d Cir. 1993). In *Edmundson*, who's facts are similar to the present case, a discharged police officer brought § 1983 action against borough and borough officials alleging he was fired in retaliation for exercising his First Amendment rights. The Circuit held that in § 1983 cases, in the absence of State Court review, only administrative factfinding is entitled to preclusive effect in Federal Courts. *Edmundson*, 4 F.3d 186, 189 (3d Cir. 1993). In other words, the Circuit based its conclusion on the premise that an administrative agency comprised of lay people, with all due respect, does not have the experience to analyze

23

and determine the validity of a First Amendment retaliation claim. *Id.* at 193. ("[W]e do not think that an administrative agency consisting of lay persons has the expertise to issue binding pronouncements in the area of federal constitutional law.").

Defendants are correct in pointing out that Plaintiff did not assert his First Amendment claim during the OAL proceedings. However, even if Plaintiff asserted the claim, the OAL would not be an appropriate forum to determine whether or not the claim has merit. Based upon the factors articulated in *Astoria*, including the specific context of the rights at stake, the power of the agency, and the relative adequacy of agency procedures, the Court finds that the various categories of administrative estoppel are not applicable at this stage of the litigation. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 111 S. Ct. 2166, 2170, 115 L. Ed. 2d 96 (1991)

Additionally, this Court finds that issue preclusion may not be applied to the Civil Service Commission's unreviewed finding that Plaintiff's termination was justified and reasonable. Therefore, Defendants' motion to dismiss Plaintiff Second Amended Complaint based upon res Judicata, Collateral estoppel, and The Entire Controversy Doctrine is denied.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motions to Dismiss (CM/ECF Nos. 72-77), are denied. An Appropriate Order accompanies this Opinion.

Date:   September 16, 2014

s/ Jose L. Linares
Jose L. Linares, U.S.D.J.